Matter of the Application of THE TRUSTEES OF THE REFORMED PROTESTANT DUTCH CHURCH of the Town of Flatbush in Kings County for the Cancellation of Assessment " In the Matter of Acquiring Title to Church Avenue from Flatbush Avenue to East Eleventh Street in the Twenty-ninth Ward in the Borough of Brooklyn, City of New York."

(Supreme Court, Kings Special Term, May, 1917.)

Religious corporations — street opening proceedings — church ground used for burial purposes not liable to assessment — Real Property Law, § 450.

> Under section 450 of the Real Property Law, land that without interruption since 1654 has been exclusively used for religious and cemetery purposes is not liable to assessment, and where such property, all of which could be rightfully used for cemetery purposes according to the long established custom following the practice of the religious corporation owning the land, has been assessed in a street opening proceeding, a motion to cancel the assessment must be granted.

APPLICATION for the cancellation of an assessment levied in a street opening proceeding.

Henry D. Lott, for petitioner.

Lamar Hardy, corporation counsel.

BENEDICT, J.   This is an application made on behalf of the " Trustees of the Reformed Protestant Dutch

144 Matter of Trustees of Ref. Prot. Dutch Church.

Supreme Court, May, 1917.        [Vol. 100.

Church of the Town of Flatbush in Kings County "
for the cancellation of an assessment levied in a street
opening proceeding whereby Church avenue was
opened from Flatbush avenue to East Eleventh street,
in the borough of Brooklyn. The amount of the assess-
ment, as confirmed by order of the Supreme Court
entered on the 29th of December, 1909, against the
petitioner's property was $1,164.50. The property in
question was assessed by assessment No. 254, lot 2,
block 5102, and the assessment was entered on the 28th
day of February, 1910.

The application is made upon the ground that the
property assessed is actually used and occupied for
cemetery purposes. If that be the case, then, under
section 450 of the Real Property Law (formerly Laws
of 1879, chap. 310), it is not liable to assessment. That
section provides: " No land actually used and occu-
pied for cemetery purposes shall be sold under execu-
tion or for any tax or assessment, nor shall such tax
or assessment be levied, collected or imposed, *  *  *
so long as it shall continue to be used for such ceme-
tery purposes."

The learned corporation counsel admits that a por-
tion of the petitioner's property affected by the
assessment is used for cemetery purposes, but he con-
tends that the statutory exemption does not apply to
that part of the petitioner's property upon which its
church edifice stands. It appears from the affidavits
submitted that other assessments affecting the real
property in question have been cancelled, under the
advice of the corporation counsel, by the finance
department of the city, upon the ground that the entire
property was used for cemetery purposes; but this
course was, apparently, not deemed appropriate as to
the assessment in question by reason of the fact that
the assessment had been confirmed by the court and

that, therefore, it could only be cancelled by the court.

The claim of the church that none of the real property in question is liable to the assessment is supported by the admitted facts and sustained by the authorities.

It is undisputed that the entire property in question has been used, exclusively, for religious and cemetery purposes without interruption since the year 1654, when the first church was erected on the land pursuant to the order of Governor Stuyvesant appointing Rev. Mr. Megapolensis and two other persons commissioners to build a church at Midwout. In the year 1698 a paper, which is still extant, was adopted by the church and entitled "Articles, Laws and Ordinances, by which the Church of Flatbush shall be governed and occupied, by the inhabitants and builders." Among the provisions therein contained were the following:

" 1. Those who are inclined to be interred within the Church, are required to pay for an adult corps of sixteen years and upwards, £4; for a corps under sixteen years to six years of age, £3; and for a child of six years and under, £2; and this shall be paid to the Church Masters, for the profit of the Church.

" 2. Those who are inclined to be permitted to be interred in the Church, are required to pay the expense of every person; for a corps of sixteen years and upwards, the sum of 27 guilders; for one under sixteen years to six years, 22 guilders; for a child of six years and under, 19 guilders, for the profit of the schoolmaster, for the time being, who shall be required to see that the graves are to be dug so deep that two coffins can be placed therein, one above the other, and that the grave for the under coffin is seven feet deep, and that he shall remove all dirt out of the church."

The second church edifice was built during the year 1699. The Reverend Thomas M. Strong, D.D., for

10

many years pastor of the church, in his History of The Town of Flatbush (p. 83), wrote in 1842 as follows:

." From this time, the practice of burying under the body of the church, became quite general. All the ministers who died after this date, (1701) during the standing of that church, were interred under the building; and this indeed was the case with all those whose friends could afford to pay the extra expenses connected with this privilege; and this accounts for the fact, that the grave yard now contains so few tomb stones of ancient date. Vast numbers of human bones were dug up when the earth was removed for the foundation of the steeple of the present church. These were all carefully preserved, and subsequently again buried. In front of the church, and under it have been interred the bodies of nearly three or four generations."

The present church edifice was erected upon the site of the two former buildings in the year 1796, the stones of the second church being used in the foundation of the third. It is claimed, further, by the petitioner, that many of the Continental soldiers killed in the Battle of Long Island, during the Revolutionary War were buried beneath the church. Upon the south wall within the present church is a memorial tablet worded as follows:

" In memory of the American Soldiers killed in the Battle of Long Island, August 26th, 1776, whose bodies lie buried beneath this Church. Erected by Fort Green Chapter National Society Daughters American Revolution, February 9th, 1904."

The tablet is, however, of very doubtful accuracy. I, myself, have not been able to discover upon what authority this claim rests. In Mrs. Vanderbilt's History of the Church, it is stated that after the battle of Long Island the wounded soldiers were carried into

this church and it was temporarily used as a hospital. Doctor Strong does not refer to the fact of soldiers' burials in the church; and, if the fact had been as claimed, he probably would not have disregarded it, especially as he says that twenty-eight new graves were counted in the churchyard, made within thirteen days, most of them probably containing more than one body; and he further says that the principal hospital for the soldiers, after the battle of Long Island, was the old school-house. See Strong's History of Flatbush, 155. Whatever the truth as to the burial of Revolutionary soldiers under the church may be, the fact remains well established that numerous other interments were made under the church.

That the legislature recognized the custom of burial in churches is shown by the provision of the acts under which the Reformed Protestant Dutch Church of Flatbush was incorporated. The said church was first incorporated under the provisions of chapter 18 of the Laws of 1784, section 6 of which provides: "that the majority of said Trustees so met as aforesaid shall have power to regulate and order the renting of pews in the said Church or Meeting Houses and the perquisites of said Church Congregation or Society arising for the breaking of ground in the Cemetery or Churchyard and in the Churches or Meeting Houses for burying the dead." The same provision is contained in section 2 of chapter 79 of the Laws of 1801, providing for the incorporation of Protestant Dutch churches, under which the said Reformed Protestant Dutch Church of the Town of Flatbush in Kings county was incorporated in the year 1804.

Henry D. Lott, Esq. states in his affidavit submitted upon this application that within his memory, while alterations were being made in the church, bones from

human bodies interred beneath the church were unearthed and again reburied.

It may not be out of place to advert, briefly, to the ancient custom regarding the interment of dead bodies in the church.

The Reformed religion was established in Holland in the year 1583, the Prince of Orange assuming the office of Stadtholder, pledging that he would maintain and promote the Reformed religion and no other, but that he would not suffer any man to be called to account, molested or hindered for his faith and conscience. The authority of the Established Church of Holland was recognized at the National Synod of Dort and the care of the transatlantic churches was committed to the Classis of Amsterdam. By that body, the colonial clergy were approved and commissioned. Broadhead's History, I, 614.

The first church organized in America in this manner is that which is now known as the Collegiate Church of New York, organized in 1628.

The second church was the one in Albany.

The first account of the building of a church in Flatbush indicates that it was built in the year 1654. Flatbush, called by the Dutch " Midwout," was first settled in 1651, and the next year a patent or ground brief was obtained from Governor Stuyvesant authorizing the inhabitants to establish and erect a town or plantation with the usual privileges of other towns in the Dutch jurisdiction. In 1655 the village plan was approved by Stuyvesant. Laws of New Netherland, p. 199.

Vice Chancellor Murray Hoffman, the author of Ecclesiastical Law of the State of New York, published in 1868, was probably the most erudite writer on the subject of ecclesiastical law that this country has produced since the time of Nicholas Trott, Chief

Justice of South Carolina, who, in 1721, published his compilation of the Ecclesiastical Law in the British Plantations. In speaking of the custom of interments in churches, Hoffman says (p. 233):

" A churchyard adjoining a church has become so associated in our minds with ancient custom and religious thoughts, that we look upon it as a most fitting place for the last sleep of relatives and friends. ' God's acre ' of the parish church was not merely the ground on which the building stood, but the sacred soil around it in whose bosom the worshippers reposed when their prayers and praises were hushed in death.

" While it is certain that the earliest places of burial were without the walls of cities, it is said that Cuthbert, Archbishop of Canterbury, brought over from Rome the custom of burying in and near churches about the year 750 (Burns, Vol. 1, p. 256).

" The practice of burying within the churches is said to be prior to that of burying in churchyards or places adjoining, but the privilege was reserved for persons of preeminent sanctity of life. It is discountenanced by the present policy of the church as injurious to the stability of the fabric and the health of the parishioners. 3 Phillimore, 349; 4 Haggard, 174.

" The learned Bingham shows clearly that the fact that the early Christians met at times in cemeteries for public worship, fails to prove that they buried in churches, or even in cities. Generally the graves and monuments of the martyrs are spoken of as being without the walls, and churches were often built over them.

" It is singular that the burying in ground adjoining churches began in connection with the introduction into the Romish Church of prayers for the remission of the pains of the departed. It is stated that the practice of burying in remote places continued to the

age of Gregory the Great, when the monks and priests beginning to offer prayers for the souls of the dead, procured leave, for their greater ease and profit that liberty of sepulture might be in churches or places adjoining them.''

This case presents an entirely different situation from that disclosed in *Matter of White Plains Presbyterian Church*, 112 App. Div. 130, because it was not shown in that case that the land upon which the church edifice was erected had been used for the interment of human remains, and it was conceded that the land upon which the church stood was liable to assessment.

It thus becomes evident, from what has been said, that the petitioner not only has the right to use all of the property affected by this assessment for cemetery purposes according to its long established custom following the practice of religious organizations from remote antiquity but that it has exercised this right in the past, and has carefully preserved and perpetuated such user to the present time, and I, therefore, reach the conclusion that this application must be granted.

Application granted.